IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



FILED
03 DEC 30 AM 10: 59
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
DEC 3 0 2003

| | |
|---|---|
| ESTATE OF PEGGY SPAIN MCDONALD, AMSOUTH BANK AS EXECUTOR,<br><br>    Plaintiff<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant | CIVIL ACTION NO.<br>02-AR-1765-S |

### MEMORANDUM OPINION

Before the court are cross motions for summary judgment. The first is by defendant, United States of America ("Government"). The second is by plaintiff, the Estate of Peggy Spain McDonald, deceased, ("Estate"). The Internal Revenue Service ("IRS") audited the Estate and determined that $504,723.08 in additional tax was owed. The IRS contends that Alabama law precluded certain actions taken before and after the testatrix's death and that the Estate had incorrectly calculated its charitable deduction. The Estate paid the amount of the alleged additional tax, plus interest, and, after further proceedings in the state probate court, seeks in this court a refund in the amount of $364,115.13, plus interest.[1] This court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).

---

[1] The amount specified in the complaint is $381,802.00. The Estate avers in its reply brief that the refund amount is $364,115.13, but it requests $690,444.91. [Doc. #31 at 15].



## Summary Judgment Facts

Peggy Spain McDonald ("Peggy") died on April 28, 1996. Her will, executed on August 21, 1986, devised personal property to certain individuals and established a family trust for the benefit of her grandchildren and their descendants with 7/8 of the residue estate. Her beneficiaries were unaware of the specifics of the will until after her death.

In a codicil dated October 23, 1987, Peggy directed the trustee to divide the grandchildrens' family trust in two. A $1 million generation-skipping transfer ("GST") exemption was allocated to one trust. The other trust would be subject to the GST tax. A second codicil, dated December 9, 1988, added the following provisions to "Item II" of the will:

> (f) I hereby forgive any debt owed to me by any child of mine and direct that such debt need not be paid to my estate.
>
> (g) I give and bequeath all shares of the stock of Tour Golf, Inc., owned by me at the time of my death, to my son, William McDonald, to be his absolutely.

A third codicil, dated April 17, 1991, and a fourth codicil, dated May 22, 1991, further revised Item II, but repeated provisions (f) and (g) without change.

On May 22, 1991, the same day upon which Peggy executed the fourth codicil, she also executed a durable power of attorney ("1991 DPOA"). Under the 1991 DPOA, Peggy's daughter, Cameron McDonald Vowell ("Cameron"), and Peggy's son, William McDonald

("William"), were jointly named as attorneys-in-fact. The 1991 DPOA took effect on February 7, 1994, when Peggy's physicians certified in writing that she was incapacitated. However, Cameron acted alone as Peggy's attorney-in-fact because William formally declined the appointment.

At the time of her death, Peggy owned 40% of the stock of a subchapter S corporation, Tour Golf Shops Limited, Inc. ("Tour Golf"); William, owned 20%, and his wife, Nancy McDonald, owned the remaining 40%. William was the president and principal operating agent of Tour Golf. Tour Golf initially operated sporting-goods stores. It purchased a driving range and opened a golf school around 1992. It was never profitable, and as of October 1995, its primary asset was real property used as a driving range (the "Valleydale Property").

On October 12, 1995, Tour Golf entered into a purchase option with Tynes Development Corporation ("Tynes") by which the Valleydale Property would be sold for $1.6 million upon its being rezoned R-5 for multifamily use. The contract was amended on November 21, 1995 to allow Tynes to purchase the property for $1.2 million if rezoned to a lower density R-4 use. The $0.4 million difference in the sales price was significant because AmSouth Bank, N.A. ("AmSouth") held more than $1.4 million in notes receivable against Tour Golf. The AmSouth notes were partially secured by a $650,000 mortgage on the Valleydale Property.

On December 1, 1995, Peggy, acting through Cameron, as attorney-in-fact, purchased the Tour Golf notes from AmSouth. Peggy thereupon became the creditor of Tour Golf, partially secured by the Valleydale Property and the guarantee. The debt was consolidated, and Tour Golf's payments were rescheduled and restructured pursuant to an Amended and Restated Note. In exchange, Tour Golf executed a second mortgage on the Valleydale Property to secure the amended note in the amount of $840,699.73 payable to Peggy. This increase in the secured obligation was accompanied by personal guarantees from William and Nancy.

Tour Golf's attempts to have the Valleydale Property rezoned failed. It continued to make payments to Peggy in accordance with the amended note until selling the property on February 20, 1997, after Peggy's death. The sale netted Tour Golf $848,545.38. Upon Peggy's death, William owned 60% and Nancy the remaining 40% of Tour Golf because the will bequeathed Peggy's 40% share to William. William and Nancy received all the proceeds from the sale. They dissolved Tour Golf on September 10, 1998, about a year after Peggy's death.

On December 7, 2001, the Probate Court of Jefferson County, Alabama found that Peggy's will expressed a clear intent to forgive all debts owed to her estate by Tour Golf. Likewise, the court found that Peggy intended the 1991 DPOA to grant joint and several power to Cameron and/or William. The court concluded that the

purchase of the debt was proper and ordered forgiveness of Tour Golf's consolidated debt under Item II(f) of Peggy's will. In addition, William and Nancy were ordered to pay the proceeds of $848,545.38 from the sale of the Valleydale Property to the Estate to prevent any unjust enrichment.

On January 28, 1997, the Estate timely filed its federal tax return. The Estate timely paid $2,363,871.85 in estate and GST taxes with the return. Forgiveness of the Tour Golf debt was treated as a devise to William under the will. Therefore, although the Tour Golf debt, $1,433,155.90, was included as an asset of Peggy's Estate for estate-tax purposes, the debt was not included in computing the value of the residuary estate subject to the GST tax. Additionally, the return assigned all of the tax burden to the family trust instead of to the charitable trust created by the will. This had the effect of decreasing the value of the residuary estate subject to the GST tax.

Around November 20, 1997, the IRS served an audit letter on the Estate and assigned an examiner, Suzanne Paulson. Paulson concluded that the Tour Golf debt was not forgiven under Peggy's Will or, in the alternative, that Cameron exceeded her authority under the 1991 DPOA when she purchased, on behalf of Peggy, the notes receivable from AmSouth. She also concluded that (1) the charitable trust should bear its pro rata portion of the taxes, and (2) that the assets in Peggy's November 9, 1977 revocable trust

should have been included in computing the value of Peggy's estate subject to the GST tax. Accordingly, the IRS assessed additional estate and GST taxes in the amount of $504,723.08, plus interest in the amount of $187,721.91 through December 15, 1999. The Estate timely paid this additional alleged amount without conceding that the Government was correct.

On December 12, 2001, after the probate court's decision that the Tour Golf debt could be purchased under the DPOA and discharged under Peggy's will, the Estate filed a refund claim. The IRS took no action on the claim. The Estate then timely filed this lawsuit challenging the IRS audit as erroneous. It seeks a refund pursuant to 26 U.S.C. § 7422 in the amount of $364,115.13, plus interest and attorneys' fees.

## Analysis

The Estate argues that the IRS incorrectly determined that: (1) Cameron's decision, as Peggy's attorney-in-fact, to purchase the Tour Golf debt from AmSouth was invalid; (2) Item II(f) of Peggy's will cannot operate to forgive the debt of Tour Golf; and (3) property qualifying for the charitable deduction must be reduced by its pro rata share of the gross estate taxes. Like a plaintiff in any civil action in district court, the taxpayer bears the burden in a tax-refund case of proving by a preponderance of the evidence the claim as to liability and amount. *United States*

v. Janis, 428 U.S. 433, 440 (1976); United States v. Harris, 216 F.2d 690, 691 (5th Cir. 1955); see also 1997 Fed. Tax Coordinator 2d (RIA) ¶ U-4707.  The Estate relies on the probate court's December 7, 2001 order to meet its burden in this court.

Federal courts are not bound by a state probate court's determination as to the character of a property interest "where the federal estate tax liability turns upon" that characterization. Comm'r of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 457 (1967).  Nor can the state court's decision have the effect of res judicata when the government was not a party to the state court proceeding.  Id. at 463.  However, the state court decision is entitled to "proper regard" when the underlying substantive rule involved is based on state law and when there is no decision on point by the highest court in that state.  Id. at 465; see also Miglionico v. United States, 323 F. Supp. 197, 200 (N.D. Ala. 1971); Estate of O'Neal v. United States, 81 F. Supp. 2d 1205, 1271-18 (N.D. Ala. 2000), aff'd in part, vacated in part, 258 F.3d 1265 (11th Cir. 2001).

In Estate of Salter v. Comm'r, 545 F.2d 494 (5th Cir. 1977), the former Fifth Circuit[2] held that "[i]n the absence of a case specifically on point, the best measure of the '[proper] regard,'

---

[2] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

we think, would be to determine, from existing precedent, in our best judgment, whether the [state] Supreme Court ... would have affirmed the [lower court's] decree had there been an appeal." *Id.* at 500. Under Alabama law, a reviewing court must affirm the trial court's findings of fact unless those findings are "plainly and palpably erroneous." *Smith v. Muchia*, 845 So.2d 85, 92 (Ala. 2003) (citing *Allstate Ins. Co. v. Skelton*, 675 So.2d 377, 379 (Ala. 1996)). However, when no material facts are disputed and an appeal solely focuses on the application of the law to the facts the trial court's decision is reviewed *de novo*. *Skelton*, 675 So.2d at 379.

Alabama law usually presumes that when two or more persons are appointed as agents under a power-of-attorney, the power cannot be exercised by one agent alone, but rather must be jointly exercised by the agents so appointed. *Leob & Bro. V. Drakeford*, 75 Ala. 464, 466 (1883); *Dorsey v. Strand*, 21 Wash.2d 217, 150 P.2d 702 (1944); cf. *Stone v. Jones*, 530 So.2d 232, 234-35 (Ala. 1988)(holding co-executors must act jointly). The Government argues that the 1991 DPOA named both Cameron and William as "attorneys-in-fact" and, therefore, that any action Cameron took by herself is invalid. The guardians *ad litem* appointed by the probate court made substantially the same argument before that court. In fact, the Government relies on many of the same cases they relied on. *Compare* [Doc. #21] *with* [Doc. #13, Ex. 28 & 29]. This presumption, however, can be overcome where the language of the power-of-

attorney, the surrounding circumstances, or the course of dealing indicate that the principal intended the appointed agents to have several authority.  2A C.J.S. *Agency* § 244 (1972).

Here, William expressly refused to accept his appointment under the 1991 DPOA.  He could not be forced to act.  His refusal did not change the fact that Peggy had been found incapacitated. The probate court, within the range of reasonableness, concluded that Peggy intended the 1991 DPOA to confer joint and several authority.  The Estate argues that the plain meaning of the phrase William and Cameron "as my 'attorney**s**'" provides several authority, whereas appointing two people as the "attorney" indicates joint authority.  *Olanrewaju v. Bankers Ins. Co.*, 688 So.2d 820 (Ala. Civ. App. 1996); *Greenleaf's Lessee v. Birth*, 30 U.S. 132 (1831). The language appointing William and Cameron "or the survivor" as the attorney-in-fact buttresses this argument.  Reading the 1991 DPOA as solely permitting joint authority eviscerates that phrase. William's formal refusal to act was the functional equivalent of his incapacity or death.  This court agrees with the probate court that the 1991 DPOA evidences an intent to confer several authority.

This court finds significant the fact that there is no suggestion by the Government of collusion by the probate court or that AmSouth has an irreconcilable conflict of interest as both creditor and executor.  Instead, the Government argues that Cameron's purchase of the AmSouth notes was not a prudent discharge

of her fiduciary duties. At the time, Peggy owned 40% of Tour Golf. Her purchase of the notes furthered the business as a going concern by avoiding a potential foreclosure on the Valleydale Property and allowing for its potential rezoning and profit on its sale. The rate of return on the restructured loan was equal to or greater than other investments that she held at the time. The debt was adequately secured and was guaranteed by William and Nancy. The purchase of the AmSouth notes appears to have been in the best interest of Peggy at the time Cameron decided to purchase them. *Sevigny*, 586 So.2d at 886-87.

The Government alternatively claims that Peggy's agent personally benefitted from this transaction and, therefore, that the transaction is void. *Sevigny v. New So. Fed. Sav. & Loan Ass'n*, 586 So.2d 884, 886 (Ala. 1991). Unlike the case in *Sevigny*, William never acted as attorney-in-fact for Peggy, and Cameron did not benefit from the purchase. No fiduciary benefitted as the result of exercising a fiduciary power in this case, and, as stated above, Peggy did benefit from the transaction. There is no reason to void the notes purchase based on this argument.

In a final attempt to discredit the purchase of the AmSouth notes, the Government contends that the purchase effected an invalid testamentary disposition. The Government's lone authority for this argument is *Kotsch v. Kotsch*, 608 So.2d 879 (Fla. 2d DCA 1992). In *Kotsch*, a son, acting under a power of attorney, created

an irrevocable trust with the bulk of his father's assets. 608 So.2d at 879. The trust provided that upon the father's death, 70% of the trust estate would go to the son and 30% to the son's three children. *Id.* The Florida court voided the trust. Unlike the decision in *Kotsch*, Cameron's purchase of the AmSouth notes for her mother did not constitute a specific devise. Nor could Cameron realistically anticipate the effect of her decision on Peggy's Estate because she did not know the content of Peggy's will and was unaware that her mother would die four months later. The purchase of the AmSouth notes in this case makes no comparable testamentary disposition. It was a proper act under the 1991 DPOA.

The Estate again points to the probate court's decision in arguing that the Government's position on the debt-forgiveness provision is without merit. The probate court concluded that the language and evidence indicated Peggy's "clear intent" to forgive any Tour Golf debts. The guardians *ad litem* argued against forgiving the Tour Golf debt. They suggested there are two critical factors in determining the intent of the testator: (1) what, if any, debts were in existence as of the date the will was signed; and (2) whether the joint obligation for which forgiveness is sought was created between the date of the will and the date of death. [Doc. #13, Ex. 28 at 14] (referring to *Argue v. Argue*, 92 N.W.2d 233 (Wis. 1958); *Waterman v. Alden*, 143 U.S. 196 (1892); *Forner v. Weidner*, 16 Ind. 198 (1861); *Heaton v. Merchant*, 35 N.J.

Eq. 561 (1882); 196 C.J.S. *Wills* § 792). The Government, relying on some of the same cases, makes much the same argument. [Doc. #21 at 22].

To determine a testatrix's intent, the plain language in her will controls. ALA. CODE § 43-8-222 (1975); *Born v. Clark*, 662 So.2d 669, 671 (Ala. 1995) ("[I]f the language is unambiguous and clearly expresses the testator's or testatrix's intent then that language must govern."). The issue turns on what Peggy intended by the phrase "**any debt** owed to me by any child." Tour Golf clearly does not fall within the definition of "any child." However, William personally guaranteed Tour Golf's debt, and he and Nancy wholly owned Tour Golf following Peggy's death. The debt owed to Peggy was, therefore, consistent with the concept of a "debt" owed by William, forgiven by the will.

Interpreting language in a legal document, such as a will, is generally a question of law and subject to *de novo* review on appeal. *See, e.g., Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir. 1986) (per curiam). When faced with an ambiguous term, however, the trial court can take any relevant extrinsic evidence that does not contradict or vary the language in order to establish the parties' intent. *See generally* RESTATEMENT (SECOND) OF CONTRACTS §§ 215, 216 (1981). The probate court admitted evidence on the issue of Peggy's intent. The determination of that intent is a factual finding. *Brewer*, 790 F.2d at 1519. The Tour

Golf debt was properly forgiven by the will because the probate court's conclusion that Peggy intended to forgive it is not "plainly and palpably erroneous" -- the standard on factual findings. *Skelton*, 675 So.2d at 379. If this court were not influenced by the probate court's conclusion it would reach the same conclusion.

The final dispute regards the Estate's deduction of 1/8 of the gross estate based on the charitable-uses deduction, 26 U.S.C. § 2055 (2002). For estate-tax purposes, the taxable value of the estate is reduced "by deducting from the value of the gross estate the amount of all" charitable bequests. 26 U.S.C. § 2055(a). The amount deductible is reduced if estate taxes are, by the terms of the will or by state law, payable in whole or in part out of a charitable bequest. 26 U.S.C. § 2055(c). This has the effect of limiting the charitable deduction to that amount actually passing to charity. *See, e.g., Luehrmann's Estate v. C.I.R.*, 287 F.2d 10, 13 (8th Cir. 1961). Under Alabama law, the apportionment of estate taxes is determined by the decedent's will. ALA. CODE § 40-15-18 (1975). The Government argues that the Estate incorrectly calculated the amount of the charitable trust gross, instead of net, of estate taxes.

Peggy's will, Item V(a), provides for a computation of the charitable trust based on the gross estate:

> If my Executor elects to claim as a deduction for income tax purposes any payment made out of the principal of my

> estate ... (2) the value of my estate for the purpose of computing the Charitable Trust shall not be reduced..., and (3) no part of such payments shall be chargeable against the Charitable Trust.

Item VII(i) of her will provides that the family trust will pay all estate taxes:

> I direct that all estate, inheritance, or death tax, if any, incurred by my estate by reason of my death shall be paid by my Executor solely out of the property designated as the Family Trust...

Nonetheless, the Government contends that the "residue is computed **net** of estate taxes." Other than this general statement, the Government makes no attempt to identify a provision of Peggy's will that dictates that result. The provisions listed above run counter to the Government's argument.

## Conclusion

By separate order, the court will grant plaintiff's motion for summary judgment on all issues and will deny defendant's motion for summary judgment.

DONE this 30th day of December, 2003.

/s/ William M. Acker, Jr.
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE